In re GOODMAN.

(District Court, N. D. Ohio. March 1, 1912.)

1. BANKRUPTCY (§ 136*)—FRAUDULENT CONCEALMENT OF PROPERTY.

Evidence *held* to fully sustain the finding of a referee that a bankrupt had in his possession or under his control a large sum of money which belonged to his estate and an order requiring him to turn the same over to his trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 233, 235; Dec. Dig. § 136.*]

2. BANKRUPTCY (§ 136*)—ORDER TO SURRENDER PROPERTY—SUFFICIENCY OF EVIDENCE.

Where the only reasonable conclusion to be drawn from the evidence before a referee is that a bankrupt has in his possession or under his control money which belongs to his estate and he has destroyed the books which should show the facts, his mere denial is not entitled to weight.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 233, 235; Dec. Dig. § 136.*]

In the matter of one Goodman, bankrupt. On petition to review order of referee requiring bankrupt to turn over money. Denied.

B. Meck, for bankrupt.

John T. Carey, for trustee.

KILLITS, District Judge. [1] This matter is before the court on petition to review the order of the referee directing the bankrupt to turn over some $6,500, which the referee finds the bankrupt has in his hands or subject to his control and property of his estate. May 10, 1910, the bankrupt, who had been for seven or eight years in the general merchandise business in the city of Upper Sandusky, for the purpose of obtaining credit, made a statement to a wholesale house in which he placed the value of his stock at $35,000 to $40,000, and the amount of his indebtedness at between $14,000 and $15,000. Two months afterwards, July 5th, he filed his petition in bankruptcy, with schedules showing an indebtedness of more than $79,000, and with assets, in the form of merchandise and a small equity in real estate, whose value he estimated at $27,000, but which were appraised at about $15,000 and sold for a little over $9,000. The examination of the bankrupt before the referee resulted in exhibiting nothing save the alternatives that either he' was phenomenally stupid, with a consequent reflection upon those who had done business with him for a number of years, or that he was concealing under an appearance of stupidity extraordinary versatility in perjury. The trustee, alleging

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that the bankrupt was concealing nearly $10,000 in money and a valuable diamond ring, petitioned for an order requiring him to turn this property over. Upon hearing by the referee on this application an order was entered as above stated.

When this matter was first before the court, on the request of the bankrupt, it was returned to the referee to permit the introduction of further testimony, principally in the bankrupt's behalf, and the case is finally before the court on the record as made in the two hearings before the referee together with the record of the preliminary examination of the bankrupt himself. The court has no hesitation in stating its opinion that this record convicts the bankrupt of an attempt to defraud his creditors through the concealment of his assets, and that the evidence is sufficient beyond a reasonable doubt to sustain the referee in finding that fact. We are also of the opinion that the referee, in fixing the amount directed to be turned over to the trustee at $6,500, dealt most liberally with this record in the bankrupt's behalf.

It passes comprehension that Goodman has made any attempt to fairly enlighten the court as to the condition of his business, and the facts and circumstances all show that his conduct was knavish and fraudulent in a high degree. All books of account and memoranda of business which the record shows from time to time the bankrupt kept and made have disappeared, except his bank deposit book, and it appears very clearly that during the last three months of his career he avoided as far as possible leaving behind any record of the condition of his business. It happened, however, that his cashier, Mrs. McAlpin, was practicing bookkeeping at her room and for material was in the habit, at the close of each day, of carrying with her memoranda of the day's business and entering the same in her practice books. Nothing appears in the record to impugn the good faith of Mrs. McAlpin's unofficial bookkeeping. From this it appears that from the 20th of April, 1910, until the filing of his petition in bankruptcy in July, the bankrupt received in cash, by way of sales of merchandise in the usual course of business, the sum of $8,430.21. He also during this time received in cash, as discount of a note, the sum of $2,950. Against this sum he accounts for $1,558.86 as deposits to his account in his bank. The disposition of the balance he wholly fails to satisfactorily explain. When he is pressed at any point and he no longer is able to find the answer that he does not remember available, he suggests that he lost money gambling and in other dissipations, but when and where he is unable to state.

A fierce attack is made upon the reliability of Mrs. McAlpin's books, mainly through the testimony of three or four salesgirls who spent more or less time during this period at work for Goodman, who, during this time, employed a force of seven or eight clerks. It appears that on Saturday, the 28th of May, 1910, a special sale which had been extensively advertised was commenced, to continue through the rest of the period until the store was closed. The store was closed the day before this date in preparation for this sale, and it appears that on the opening day in question, from Mrs. McAlpin's books, the

sales amounted to $614. The most definite testimony by way of impeachment of Mrs. McAlpin's testimony and bookkeeping has reference to the business done on this occasion, the girls testifying that the sales on the 28th of May, 1910, were light and the business done a great disappointment because the day was cold and stormy and the time of the clerks was most largely employed in standing about the stove, keeping warm. The court's curiosity has developed the fact from an examination of the records of the United States Weather Bureau that the day in question was clear and free from precipitation, with a maximum temperature of 77 degrees and a southerly wind. Comment on the testimony of the clerks produced by the bankrupt is unnecessary.

In view of the confessed destruction of all the bankrupt's data as to amount of business done we may readily accept Mrs. McAlpin's report, which is corroborated by the fact that during the period of her bookkeeping showing sales of over $8,000, as above stated, Mr. Goodman purchased and put out to his customers trading stamps representing, at the most accurate estimate, at the very least an amount of goods equal to this sum, giving him the benefit of all reasonable deductions.

We find a curious state of facts in Goodman's bank book, and one which lends color to the claim that his failure was not honest. During the first six months of 1909 his bank book shows deposits of $19,000 and more. During a corresponding period of 1910 his book shows deposits of a little less than $8,000, and, curiously enough, this discrepancy is confined to the last four months, for his deposits for January and February were $500 greater than his deposits for similar months in 1909, and still his deposits for March to June, inclusive, in the last year, were nearly $12,000 less than for the corresponding period of the previous year. In June, 1910, he deposited $439 against $3,651 in June, 1909. According to Mrs. Alpin's books, his sales during June, 1910, were about $3,600, representing approximately the same amount of business as that done in June, 1909, if we may judge by the state of his bank deposits for that year and month. This, taken in connection with the character of his testimony, speaks nothing less than an attempt on his part to defraud creditors.

Against the force of this evidence, we have only the vague and unsatisfactory testimony of the bankrupt, who has failed to make any credible explanation for these appearances against him and who certainly has himself taken measures to destroy all opportunity to corroborate his improbable statements.

[2] The referee was not required to await definite proof that the avails of this business were actually in the bankrupt's possession or subject to his control. He was authorized to render the order granted when no other reasonable conclusion than that the bankrupt had in his possession or control a certain sum of money was deducible from the facts presented by the record. That is the situation here, and against the only deductions which reasonable and honest men can draw from these facts the mere denial of the bankrupt has no force. In re Gerstel (D. C. Ill.) 10 Am. Bankr. Rep. 411, 123 Fed. 166;

Schweer v. Brown (C. C. A. 8th Cir.) 12 Am. Bankr. Rep. 178, 130 Fed. 328, 64 C. C. A. 574; In re Schlesinger (D. C. N. Y.) 3 Am. Bankr. Rep. 342, 97 Fed. 930.

The order made by the referee in this behalf will be the order of the court, and the petition for review is denied.